**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MARINE BARGAS,

                       Plaintiff,

    v.

RITE AID CORPORATION, and DOES 1
through 50, inclusive,

                Defendant.

        )
        )
        )
        )
        )

Case No. CV 13-03865- MWF (JEMx)

**AMENDED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

     This matter came on for trial before the Court sitting without a jury on November 1 through November 10, 2016.  Following the presentation of evidence and the parties' closing arguments, the matter was taken under submission.

     Having carefully reviewed the record and the arguments of counsel, as presented at the trial and in their written submissions, the Court now makes the following findings of fact and reaches the following conclusions of law under Rule 52 of the Federal Rules of Civil Procedure.  Any finding of fact that constitutes a conclusion of law is also hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is also hereby adopted as a finding of fact.

The Court awards a modest verdict to Plaintiff Marine Bargas based on certain weeks in which she was classified improperly as an exempt employee. That sentence encompasses why this action was unusual. The dispute was not whether overtime hours were worked, although the Court concludes that Plaintiff overstated her hours to a degree. Ultimately, the dispute was not even whether the job itself could properly be classified as exempt or not. Defendant Rite Aid Corporation ("Rite Aid") acknowledged that the job included a mix of exempt and nonexempt duties, and that managers of smaller stores are not exempt employees.

The real dispute then was, week by week, whether *this* Plaintiff's nonexempt work as actually performed constituted more than 50% of her time. The Court finds that, in general, Plaintiff did not spend most of her time on nonexempt work. In other words, Rite Aid largely proved its affirmative defense of the executive exemption. However, the parties do not really dispute that Plaintiff is entitled to a week by week determination of her correct classification. As for those weeks in which Plaintiff was assigned to other stores for remodeling or inventory, her work as performed was primarily nonexempt.

The following witnesses were called and examined by the parties in the order recited below:

On November 1, 2016, Michael Righetti appeared on behalf of Plaintiff Marine Bargas and gave an opening statement. Elena R. Baca and Justin M. Scott appeared on behalf of Defendant Rite Aid Corporation ("Rite Aid") and gave an opening statement.

On November 2, 2016, Mr. Righetti examined **Kandice Valdivia**, a former Rite Aid store employee who worked for Plaintiff. Ms. Baca cross-examined Ms. Valdivia; Mr. Righetti conducted a redirect examination; and Ms. Baca conducted a recross examination. Mr. Righetti next examined **Mauricio Quintanilla**, a former Rite Aid store employee who worked for Plaintiff. Ms. Baca cross-examined Mr. Quintanilla. Finally, Mr. Scott examined **Paul Bennie**, a former Senior Director of Human Resources for Rite Aid. Mr. Righetti cross-examined Mr. Bennie.

On November 3, 2016, Mr. Righetti examined **Carlos Aguila**, a Rite Aid store employee who worked on a remodeling project with the Plaintiff.  Mr. Scott cross-examined Mr. Aguila; and Mr. Righetti conducted a redirect examination.  Next, Mr. Righetti examined **Marilyn Contreras**, a current District Manager for Rite Aid and Plaintiff's former District Manager, as a hostile witness.  Ms. Baca cross-examined Ms. Contreras; Mr. Righetti conducted a redirect examination; and Ms. Baca conducted a recross examination.

On November 4, 2016, Mr. Righetti examined **Rebecca Yam**, a former Store Manager for Rite Aid.  Ms. Baca cross-examined Ms. Yam; Mr. Righetti conducted a redirect examination; and Ms. Baca conducted a recross examination.  Next, Mr. Righetti examined Plaintiff **Marine Bargas**.  Plaintiff was not cross-examined on November 4.  Finally, Ms. Baca examined **David Markley**, the current Vice President of Financial and Labor Analysis for Rite Aid.  Mr. Righetti cross-examined Mr. Markley.

On November 8, 2016, Mr. Righetti examined **Roger Ceballos**, a current Senior Director of Human Resources for Rite Aid, as a hostile witness.  Mr. Scott cross-examined Mr. Ceballos; and Mr. Righetti conducted a redirect examination.  Mr. Scott next examined **Imelda Fernandez**, a current Rite Aid store employee who previously worked for Plaintiff.  Mr. Righetti cross-examined Ms. Fernandez.  Ms. Baca then examined **Maria Garcia**, a current Rite Aid store employee who previously worked for Plaintiff.  Mr. Righetti cross-examined Ms. Garcia; Ms. Baca conducted a redirect examination; and Mr. Righetti conducted a recross examination.  Finally, Mr. Scott examined **Cynthia Pena**, a current Rite Aid store employee who previously worked for Plaintiff.  Mr. Righetti cross-examined Ms. Pena; Mr. Scott conducted a redirect examination.

On November 9, 2016, Ms. Baca cross-examined Plaintiff.  Mr. Righetti began a redirect examination of Plaintiff.

On November 10, 2016, Mr. Righetti concluded his redirect examination of Plaintiff; Ms. Baca conducted a recross examination.  Next, Mr. Scott examined **Lisa Angulo**, a current Rite Aid store employee who previously worked for Plaintiff.  Mr.

Righetti cross-examined Ms. Angulo.  Mr. Scott next examined **Leodoro Rodriguez** and **Robyn Brouillette**, both current Rite Aid store employees who previously worked for Plaintiff.  Mr. Righetti cross-examined Ms. Brouillette but did not cross-examine Mr. Rodriguez.  Mr. Scott then examined **Bonnie Reyes**, a current Rite Aid store employee who previously worked for Plaintiff.  Mr. Righetti cross-examined Ms. Reyes.  Finally, Mr. Scott examined **Kellie Reyes**, a former Rite Aid store employee who worked for Plaintiff.  Mr. Righetti cross-examined the second Ms. Reyes.

At the end of the day on November 10, Mr. Righetti made his closing argument for Plaintiff.  Ms. Baca made her closing argument for Rite Aid.

An appendix listing all exhibits admitted into evidence during trial is attached.

## I.   FINDINGS OF FACT

### A.   Background

1.      Plaintiff Marine Bargas is an individual and citizen of the State of California.

2.      Defendant Rite Aid is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in the Commonwealth of Pennsylvania.

3.      Rite Aid runs a national chain of drugstores.  Each store is split between the pharmacy side and the retail side.  Pharmacy and retail each have separate, independent management structures, labor budgets, corporate mandates, and so on.  Plaintiff worked on the retail side of the business.

4.      Corporate oversight of stores is divided by region.  The western region, encompassing all of the stores where Plaintiff worked, includes California, Oregon, Idaho, Washington, and Colorado.  Regions are further subdivided into states and districts within states.  Each district is run by a team of managers:  a Loss Prevention Manager, a Human Resources Manager, a District Manager for pharmacy, and a District Manager for retail.

5.      In California, each store within a district typically is staffed with a Store Manager, an Assistant Manager, two Shift Supervisors (sometimes divided between a

Merchandising Supervisor and a Service Supervisor), a Price Accuracy Coordinator ("PAC"), and regular non-management staff, typically referred to as clerk/cashiers.

6.     The duties of clerk/cashiers include carrying out day-to-day tasks on the sales floor.  Clerk/cashiers complete merchandising, unload stock when shipments come in (what witnesses commonly referred to as "breaking down truck"), price changes, keeping stock and the sales floor clean, neat, and orderly, and ringing up customers.

7.     In training materials, Rite Aid describes the duties of the remaining staff positions as follows (*see* Ex. 183):

> a.  **Store Managers** are expected to provide leadership and development opportunities to associates (*i.e.*, every other store employee), to hire and train new associates (which includes ensuring the store team is properly trained and adheres to regulations, legislation, and Rite Aid policies), and to implement the annual corporate plan.  Store Managers are responsible for meeting store retail sales budgets, labor and expense budgets, and generally ensuring that operating earnings before interest, tax, depreciation and amortization ("EBITDA") targets are achieved.  Store Managers are also responsible for store inventory, including ordering and loss prevention.

> b.  **Assistant Managers** are expected to assist the Store Manager with all store operations.  Assistant Managers must be able to complete all Store Manager duties in the Store Manager's absence, ensure Rite Aid policies and procedures are enforced among associates, and oversee merchandising and stocking.  Those duties include overseeing the stocking of regular store aisles and those aisles dedicated to seasonally-available merchandise (the "seasonal aisles"), the stocking of aisle end caps, and generally ensuring that all merchandise is arranged according to the corporate plan (the "planogram").  Like Store Managers, Assistant Managers must interact with vendors to order seasonal and

1           promotional inventory, request store maintenance when required,

2           process returned, recalled, damaged, and outdated merchandise, and

3           help keep track of vendors' accounts payable.

4       c.  **Shift Supervisors** assist Store Managers and Assistant Managers in

5           executing corporate plans, and supervising clerk/cashiers in their floor

6           tasks and in the provision of customer service.  Shift Supervisors focus

7           on working with the front line retail cashiers and clerks on a daily

8           basis.

9       d.  **PAC**s implement weekly price changes, ad sale pricing, and generally

10          ensure that items are priced correctly based on corporate directives.

11          PACs conduct audits; additionally, PACS report the results of third

12          party and government audits to the proper corporate entities.  The PAC

13          role is particularly circumscribed, as PACs are forbidden from helping

14          with the other day-to-day tasks of running the store.

15     **B.**    **The Store Manager Position**

16       8.    Of all the in-store employees on the retail side of the business, only the Store

17 Manager is classified as exempt from California's overtime law. (The Court discusses

18 California's overtime law and the relevant exemptions thereto in greater detail below.)

19       9.    The Store Manager job description for California lists the following

20 "Essential Duties and Responsibilities" for the position (*see* Ex. 4), which the Court has

21 lightly paraphrased for readability:

22       a.  Implement company business plans and objectives to drive sales, be

23          profitable and provide a superior customer and associate experience.

24       b.  Attend to opening and closing the store and maintaining proper

25          accountability for cash handling and company banking.

26       c.  Manage an individual store while meeting store retail budgeted sales,

27          margin, labor, expenses and overall [profit and loss] monthly results.

28

d.  Interview, hire, train, direct, reward, and discipline associates; evaluate associate performance; and resolve complaints.

e.  Provide leadership and development opportunities for associates by communicating career opportunities, providing regular performance feedback, and demonstrating good customer service behaviors to both external and internal customers and associates.

f.  Ensure the store complies with regulations, legislation, and policies.

g.  Direct and assist store associates by providing a clean, safe, and pleasing environment to customers and associates.  Follow company standards for safety regulations and overall store appearance, including keeping the store clutter free.

h.  Maintain merchandise as required by the various tools provided by Rite Aid, including the profit planner, corporate planograms, and other regularly updated corporate mandates.

i.  Supervise store inventory, and develop plans for loss prevention.

j.  Manage the store's vendor relationships.

k.  Ensure price accuracy of merchandise.

10.   However, not every store in California is staffed the same; Rite Aid may expand or contract the management staff depending on the sales volume of the store. (*See* Ex. 183).  Each store always has a PAC and some number of clerk/cashiers.

a.  In stores with a "front end volume" (that is, the sales volume of the retail side of the business) of $750,000 to $1.5 million, the Store Manager position is nonexempt.  The Store Manager does not have an Assistant Manager, but is afforded three Shift Supervisors, two full time and one part time.

b.  In stores with a front end volume higher than $1.5 million, the Store Manager position is exempt.

     c.  Stores with a front end volume between $1.25 million and $2.5 million are staffed with an Assistant Manager, and two full-time Shift Supervisors, in addition to the Store Manager.

     d.  Stores with a front end volume greater than $2.5 million are staffed with a Store Manager, an Assistant Manager, and three full-time Shift Supervisors.

11.    Accordingly, at least in some limited circumstances, Rite Aid itself recognizes that the Store Manager position may necessarily be classified as nonexempt. That is, the duties a Store Manager must perform require a mixture of exempt and nonexempt work; and, in some circumstances, the volume of nonexempt duties exceeds more than half of the workload, requiring those Store Managers to be officially classified as nonexempt.

12.    In its training materials, Rite Aid further recognizes that even Store Managers who are classified as exempt may at times find themselves performing more nonexempt duties than exempt duties.

     a.  In a training program in 2005, Rite Aid handed out a "self-audit" to Store Managers, asking them to report whether they spent more than 50% of their time on nonexempt, nonmanagerial tasks.

     b.  In 2006, Rite Aid distributed a "Front End Manager Audit" to California Store Managers via Rite Aid's electronic communications system.  Store Managers were again asked to evaluate how much time they spent each day performing managerial and nonmanagerial tasks.

     c.  Rite Aid stopped asking Store Managers to report how they divided their time between managerial and nonmanagerial tasks after 2006.

13.    Paul Bennie, former Senior Director of Human Resources for Rite Aid, testified that Store Managers are informed, via computer based training modules, of Rite Aid's expectations that Store Managers will spend more than 50% of their time on

managerial tasks.  Rite Aid presented evidence that Plaintiff completed these computer based trainings.

14.     However, Plaintiff testified that it was easy for Store Managers to skip through the computer based training without paying close attention.  Indeed, to some extent it was incentivized:  the trainings themselves were two, sometimes three hours long, and employees could access them from cash registers.  Many Store Managers and other Rite Aid associates completed their computer based trainings while checking out customers.

15.     Plaintiff explained that, while clicking through the slides, "I'm going back and forth.  I'm not really paying attention.  We're just trying to get [the computer based trainings ("CBT")] done because we have a lot of work to do.  And that takes — some of these take two hours, three hours."  Later, Plaintiff testified "I don't remember really going through them.  I'm just trying to get them out of the way to get back to what I'm supposed to be doing in the store."  And later still, Plaintiff illustrated:

> [S]ay, for instance, if I'm in the register and I'm doing my CBT, I could be helping a customer here, and then over here, I'm doing my CBT training.  And I let it run so I could go faster.  And then I come back again, take care of [a] customer.  I would just skip to the next page.  And then come back to my—to my customer.  And then I'll go back.  And I'm looking at it.  I'm just trying to skip, next, next.  Because I'm just trying to get it out of the way because we already have so many things to do. We didn't care—not that we didn't care.  But everybody just wanted to get the CBTs out of the way.

C.     **Marine Bargas' Employment with Rite Aid**

16.     In about June 2001, Plaintiff Marine Bargas applied for a cashier/clerk position at Rite Aid.  She was hired to work at a store located in downtown Los Angeles. Plaintiff worked at that store for about three years.  During that time, Plaintiff was promoted from cashier/clerk to PAC.

17.     After about three years, Plaintiff's husband (then, her boyfriend), with whom she had been working, received a promotion.  As a result, Plaintiff was transferred to a different downtown store.  In about 2003 or 2004, after a few months working in the new downtown location, Plaintiff received a promotion to Shift Supervisor.  This promotion elevated Plaintiff to the management team for the first time.

18.     As a Shift Supervisor, Plaintiff received a set of keys to the store and the office, and access to the safe.  Plaintiff was authorized to open and close the store, and to do most other tasks associated with management outside of hiring, firing, and scheduling store associates.

19.     After about six or seven months, Plaintiff was transferred to another Rite Aid store in downtown Los Angeles.  Soon after the transfer, Plaintiff was promoted to Assistant Manager.  Plaintiff worked as an Assistant Manager at the third downtown store for about two to three years.

20.     After about three years, Plaintiff's District Manager asked to her to take on a new role traveling between stores in southern California to help Store Managers stay caught up with their obligations.  Often, Plaintiff was asked to help with some of the physical labor in the stores in order to free up trainee Store Managers to focus on learning their management duties.

21.     Plaintiff estimated that, in her new role, she worked at a new store about every three months.  Plaintiff worked at stores in Alhambra, Rosemead, Pico Rivera, Compton, Commerce, and others.

22.     Eventually, Plaintiff was promoted to Store Manager.  Rite Aid employed Plaintiff as a Store Manager from June 14, 2009 to April 5, 2013.  The whole time Rite Aid employed Plaintiff as a Store Manager, it classified her as an exempt employee under California's labor laws.

23.     In June 2009, Plaintiff was assigned to a store in the city of **Downey**, California.  Plaintiff worked at the Downey store for about a year.

24.     Near the end of June 2010, Plaintiff went on maternity leave.  When she returned to Rite Aid in October 2010, she was assigned to a different store in the city of **Commerce**, California.  Plaintiff managed the Commerce store for a little over two years.

25.     In September 2012, Plaintiff was transferred to a store in the city of **Maywood**, California.  Plaintiff remained a Store Manager at the Maywood store until she left Rite Aid in April 2013.

26.     For the pay periods between June 14, 2009 and April 24, 2010, Plaintiff's weekly salary as a Rite Aid Store Manager was **$1,038.46**.  For the pay periods between April 24, 2010 and April 24, 2011, Plaintiff's weekly salary was **$1,064.42**.  For the pay periods between April 24, 2011 and May 5, 2012, Plaintiff's weekly salary was **$1,080.38**.  For the pay periods between May 5, 2012 and April 5, 2013, Plaintiff's weekly salary was **$1,107.39**.  Plaintiff's salary as a Store Manager was at least twice the state minimum wage for full time employment.

27.     Rite Aid required that a member of the management team with keys (that is, a Store Manager, an Assistant Manager, or a Shift Supervisor) be present in the store at all times during open business hours.

28.     During her employment as a Store Manager, Rite Aid did not pay Plaintiff premium overtime wages when Plaintiff worked more than 40 hours per week.  Rite Aid also did not pay Plaintiff premium overtime wages when she worked more than eight hours per day.

29.     Rite Aid did not keep records of the actual hours Plaintiff worked.

30.     Rite Aid did not keep records of when Plaintiff's meal periods began and ended, or whether Plaintiff was afforded rest breaks.

31.     As a Store Manager, Plaintiff never received an additional hour of pay on days when she did not receive an uninterrupted, off-duty meal period lasting at least 30 minutes before the end of the fifth hour of work (*i.e.* meal period premium wages).

32.     As a Store Manager, Plaintiff never received an additional hour of pay on days when she did not receive an uninterrupted, off-duty rest break lasting at least ten minutes for every four hours of work (*i.e.* rest break premium wages).

### D.     **Marine Bargas' Schedule**

33.     DOWNEY:  Plaintiff testified that she worked 12 hour days five days per week for the first three months she managed the Downey store.  Plaintiff testified that she worked 10–12 hour days about three days per week thereafter, until she went on maternity leave.  Plaintiff testified that she worked a sixth day per week about twice per month and said that she worked a 24 hour shift between four and seven times while managing the Downey store.

34.     COMMERCE:  Plaintiff testified that for about the first three months she managed the Commerce store, she worked 12 hour days five days per week.  Plaintiff did not testify to her typical schedule thereafter at Commerce.

35.     MAYWOOD:  Plaintiff testified that she worked 12 hour days six days per week for about the first six months that she worked there.  She estimated that there was only about one week per month during that time that she did not work six days per week. Plaintiff did not testify to her typical schedule thereafter at Maywood.

### 1.     **Schedule Data**

36.     Rite Aid kept a record of the times that Plaintiff was scheduled to work between December 2009 (about six months after Plaintiff became a store manager at Downey) and March 2013 (about a month before Plaintiff left Rite Aid, on April 4, 2013). These records were admitted into evidence as a Microsoft Excel file.  (*See* Exhibit 185A). In total, Exhibit 185A includes 741 time entries for Plaintiff.

37.     Plaintiff testified that a typical shift lasted nine hours, comprised of an eight hour workday plus one hour for lunch.  Of the 741 entries, 205 (or about 28%) recorded a scheduled shift of greater than nine hours.  Eighty six entries (or about 12%) recorded a scheduled shift of less than nine hours.  Plaintiff was thus scheduled to work a regular nine hour shift about 60% of the time.

38.   Exhibit 185A also records that Plaintiff was scheduled to work six days per week for 20 out of 144 total weeks.  She was scheduled to work seven days per week for three weeks.  In sum, Plaintiff was scheduled to work more than five days per week about 16% of the time.

39.   At the Downey store, Plaintiff was typically scheduled to work a 9:00 a.m. to 6:00 p.m. shift, although she was not infrequently scheduled to work 9:00 a.m. to 7:00 p.m. or 8:00 a.m. to 5:00 p.m.

40.   At the Commerce store, Plaintiff was typically scheduled to work from 7:00 or 8:00 a.m. to 5:00 p.m.  Near the end of her time at Commerce, Plaintiff typically was scheduled to work from 7:30 a.m. to 4:30 p.m.

41.   At the Maywood store, Plaintiff was typically scheduled to work either 6:00 a.m. to 3:00 p.m. or 7:00 a.m. to 4:00 p.m.  Plaintiff was also occasionally scheduled to work from 5:00 a.m. to 2:00 p.m. or 6:30 a.m. to 3:30 p.m.

### 2.   Testimony re Actual Hours Worked

42.   Plaintiff testified that the schedule was not an accurate representation of the amount of time she actually worked.  Plaintiff testified that she occasionally arrived to work later than she was scheduled or left earlier than she was scheduled to leave.  Plaintiff testified that on other occasions, she would arrive to work one or two hours earlier than she was scheduled and often stayed several hours later than she was scheduled.  Plaintiff further testified that she often was asked to attend meetings or take part in inventories on days when she was scheduled to be off.

43.   Mauricio Quintanilla, who was a shift supervisor with Plaintiff at the Downey store, testified that his shift overlapped with Plaintiff's about four out of five days per week.  Quintanilla typically worked from 3:00 p.m. until 11:00 p.m.  Quintanilla testified that he believed Plaintiff usually started work at 7:00 a.m.  He typically saw Plaintiff leave work at 6:30 or 7:00 p.m.

44.   Bonnie Ray Reyes, who was a cashier/clerk for Plaintiff in the Downey Store, testified that Plaintiff typically left work at 6:00 or 7:00 p.m.

45.     Kandice Valdivia, who was first a shift supervisor and later an assistant manager with Plaintiff at the Commerce store, testified that on days when the store received stock ("load days"), Valdivia would arrive at 5:00 a.m. to unload the truck.  Load days occurred about once per week.  On those days, Plaintiff would arrive at 7:00 a.m. to open the store.  Sometimes, this pattern was reversed:  Plaintiff would arrive at 5:00 a.m. to help with the load, while Valdivia would arrive at 7:00 a.m. to open the store.  Valdivia testified that on load days Plaintiff would typically leave around 6:00 or 7:00 p.m.

46.     Valdivia testified that she typically observed Plaintiff leave work at 5:00 or 6:00 p.m., but also remembered seeing Plaintiff stay until the store closed at 9:00 or 10:00 p.m. a few times per month.

47.     Imelda Fernandez, who occasionally worked the opening shift at the Commerce store with Plaintiff, testified that she would sometimes arrive half an hour to an hour later than she was scheduled.  Fernandez testified that when she worked the closing shift she would typically arrive at 3:30 or 4:30 p.m., at which time Plaintiff typically would have already left for the day.  Fernandez testified that she never saw Plaintiff stay for a full eight hour shift.

48.     Maria Garcia, who regularly worked the opening shift at the Commerce store with Plaintiff, testified that Plaintiff would arrive half an hour later than she was scheduled about 80% of the time.  Garcia further testified that it was her understanding that Store Managers were expected by their District Managers to work ten hours per day, at least five days per week, and that Store Managers were expected to be in the store until at least 5:00 p.m.

49.     Cynthia Pena, who often worked the opening shift at the Commerce store with Plaintiff, testified that Plaintiff would usually arrive between ten minutes and half an hour later than she was scheduled.

50.     Carlos Aguila was an assistant store manager at the Maywood store with Plaintiff starting in October of 2012.  He testified that Plaintiff typically worked the

morning shift, whereas he typically worked either the mid or closing shift.  Aguila
testified that his shift would overlap with Plaintiff's about three or four times per week.

51.    Aguila testified that he typically saw Plaintiff leave work at 6:00 or 7:00 p.m.
He remembered that she would stay late stocking, building displays, and so on.  Aguila
never saw Plaintiff leave earlier than 5:00 p.m.

52.    Aguila testified that Plaintiff frequently came in to work on her day off; that
is, he frequently saw her working a sixth, unscheduled day.

53.    Lisa Angulo, who was an assistant manager for Plaintiff for three months at
the Maywood store, testified that she sometimes observed Plaintiff leave early; typically,
Plaintiff would explain that she was leaving early because she had not taken a lunch.

54.    Marilyn Contreras, Plaintiff's District Manager at Maywood, testified that
she sent out the email in Exhibit 78 informing Store Managers that they were not to leave
before 5:00 p.m. without specific permission.  Contreras explained that she was criticized
by a supervisor for that email, but never expressly communicated to her Store Managers
that they were permitted to leave before 5:00 p.m.

### 3.    Findings

55.    Based on the foregoing, the Court finds that Plaintiff typically worked in
excess of 40 hours per week.  Even crediting the testimony that Plaintiff regularly arrived
a half hour late to work, most of the testimony confirms that Plaintiff left after 6:00 p.m.
nearly every time she worked a morning shift, which was most of the time.

56.    The Court also relies on Plaintiff's scheduled hours to provide a baseline
estimate of the hours Plaintiff actually worked.  Although the witnesses consistently
testified to the fact that Plaintiff's schedule was not an accurate record of the time she
actually spent at work, the Court finds it instructive that, consistent with the testimony
regarding her actual hours, Plaintiff was occasionally scheduled to work six or even seven
days per week, and that Plaintiff was scheduled to work more than nine hours per day
almost a third of the time.  Considering Plaintiff's schedule together with the testimony
that Plaintiff often came to work late but typically worked later than she was scheduled,

and sometimes worked days when she was not scheduled, the Court finds that, on average, Plaintiff worked between 45 and 50 hours per week throughout her time as a Rite Aid Store Manager.

### E.   **Marine Bargas' Weekly Tasks**

57.   Mauricio Quintanilla, who worked with Plaintiff at the Downey store, testified that he frequently saw her on the floor doing the sorts of work that other store associates do, including stocking merchandise, working on the seasonal displays, working at the registers, dipping ice cream, or working in the photo department.  Quintanilla estimated that he saw Plaintiff engaged in these tasks about 80% of the time and rarely saw her in the back office.

58.   Quintanilla testified that his lunch hour was typically at 5:30 or 6:00 p.m.  He testified that Plaintiff would usually take over whatever he was doing — whether he was on the register or the sales floor stocking shelves — while he took an hour for lunch.

59.   Robyn Brouillette, who worked with Plaintiff for about two months at the Downey store, testified that Plaintiff spent most of her time in the office — about five or six hours per day.  Brouillette testified that when Plaintiff did come out onto the floor, she typically was responding to an associate request for assistance (*e.g.*, voiding a transaction or approving a return) rather than assisting the associates with the manual labor of running the store.

60.   Bonnie Ray Reyes, who worked with Plaintiff for a few months at the Downey store, testified that Plaintiff was in the office about 85% of the time.  Reyes usually overlapped with Plaintiff in the afternoon.  When Reyes saw Plaintiff on the sales floor, Plaintiff was typically walking the store and checking in with associates, rather than scooping ice cream, stocking, breaking down load, or cleaning.

61.   Kellie Reyes, who also worked with Plaintiff for a few months at the Downey store, testified that she saw Plaintiff in the office about 75% of the time.  Reyes testified that when she saw Plaintiff out on the floor, it was typically to do managerial tasks, such as checking on stock.  Reyes testified that because she worked with Plaintiff while

Plaintiff was pregnant, Reyes rarely saw Plaintiff do much manual labor.  Occasionally Reyes saw Plaintiff stocking and cleaning the area around the registers.

62.    Kandice Valdivia, who worked with Plaintiff at the Commerce store, testified that Plaintiff did not typically sit in the office while she was working with Valdivia. Plaintiff would complete any tasks that had to be done in the office early in the day, and then would come out onto the floor to help out her associates.  Valdivia frequently saw Plaintiff breaking down load, stocking shelves, and working on the floor.  Valdivia testified that Plaintiff would frequently relieve employees on the register to allow them to do other tasks in the store.

63.    Imelda Fernandez, who worked with Plaintiff at the Commerce store, testified that Plaintiff spent most of her time in the office.  Fernandez testified that when Plaintiff did come out of the office, she would check in at the front, greet customers, give instructions for restocking, and then return to the office.  Fernandez rarely saw Plaintiff doing manual labor in the store, *e.g.* scooping ice cream, stocking, breaking down load, or cleaning.

64.    Fernandez testified that she frequently saw Plaintiff take a lunch, but that the associates in the store felt free to interrupt Plaintiff's lunch with questions about work. Fernandez testified that, on occasion, she herself interrupted Plaintiff's lunch with work-related questions.

65.    Maria Garcia, who worked with Plaintiff at the Commerce store, testified that she saw Plaintiff in the office more often than Garcia saw Plaintiff on the floor doing manual labor.  When Garcia had questions for Plaintiff, or needed help with a task, typically she would find Plaintiff in the office.

66.    Garcia also testified that on most days, Plaintiff would spend a full hour eating lunch in the breakroom with Garcia.

67.    Cynthia Pena, who worked with Plaintiff at the Commerce store, testified that in her estimation Plaintiff spent about 80% of her time in the office.  Pena did not recall

seeing Plaintiff doing much manual labor in the store; specifically, Pena did not frequently see Plaintiff stocking, breaking down the load, scooping ice cream, or cleaning.

68.     Carlos Aguila, who was an assistant manager for Plaintiff at the Maywood store, testified that on load days Plaintiff would typically work the registers and stock the front part of the store while the rest of the employees pulled the merchandise off the truck and stocked the shelves.  This occurred during a period of about six to seven hours once per week.

69.     Lisa Angulo, who worked with Plaintiff at the Maywood store, testified that she saw Plaintiff spend more time in the office doing paperwork than on the floor. Angulo testified that she only occasionally saw Plaintiff stocking or breaking down load and never saw Plaintiff cleaning.  She testified that of the three or four hours that she typically overlapped with Plaintiff, she would see Plaintiff doing floor tasks like helping customers or scooping ice cream for about an hour.

70.     Leodoro Rodriguez, who worked with Plaintiff at the Maywood store, testified that Plaintiff spent more time on the floor than in the office.  He testified that Plaintiff frequently received phone calls from her husband, which she had to go into the office to take.

### 1.     Inventories

71.     Plaintiff testified that while she managed the Downey store, she took part in preparations for inventories in about five other stores.  She often was asked to help with inventory preparations on her days off.  Each inventory took about six hours.

72.     Plaintiff's tasks included organizing and packing away product, stocking shelves, completing paperwork, and so on.

### 2.     Remodels

73.     Plaintiff testified that while she managed the Commerce store, she took part in remodels at two other stores: Long Beach/Compton and Downey.  Plaintiff's responsibilities during the remodels included cleaning and stocking shelves, putting new labels on product, unloading stock from the truck, and setting up planograms.

74.     Plaintiff testified that she worked three days per week for four weeks on the Long Beach remodel.

75.     Carlos Aguila testified that he met Plaintiff while working on the remodel of the Long Beach store.  He testified that the Long Beach remodel occurred in about 2009 and lasted about a month.  Aguila saw Plaintiff working on the remodel at Long Beach "a couple" times per week, for multiple weeks.  During the remodel, Aguila saw Plaintiff stocking shelves and otherwise generally taking part in the physical tasks of the remodel.

76.     The Court infers that Plaintiff adjusted her schedule at the Commerce store accordingly, such that she worked a typical 45–50 hour week during the remodel.

77.     Plaintiff testified that she only worked the day of the grand opening for the Downey remodel.  She spent a day cleaning the store, organizing it, and setting up tables.

78.     Plaintiff testified that during the Downey remodel, she sent two Assistant Managers to help with the remodel.  As a result, she was short-handed, and had to work a full eight hour shift on her day off.  Plaintiff estimated that during the remainder of the three-week Downey remodel, she worked twelve hours per day, five days per week, to make up for the missing labor.

79.     Additionally, the Maywood store was remodeled while Plaintiff was employed as its Store Manager.

80.     Carlos Aguila testified that he worked on the remodel of the Maywood store with Plaintiff.  He testified that the remodel lasted about a month.  During that time, Aguila testified that Plaintiff worked alongside the other store associates to complete the physical work of the remodel, including stocking shelves and so on.

**3.     Findings**

81.     Although there is conflicting testimony on this point, the Court credits the numerous, relatively uninterested witnesses who testified that Plaintiff was usually in the office during the work day.

82.     In addition to the time Plaintiff spent in the office, the testimony makes clear that Plaintiff also spent some portion of her time on the floor performing managerial tasks.

There is ample testimony that Plaintiff conducted walk-throughs, trained associates on the floor, and otherwise took the opportunity to direct her associates in their tasks. Accordingly, the Court finds that Plaintiff typically spent more than 50% of her time on managerial tasks.

83.     The Court further finds, however, that Plaintiff spent the majority of her time performing nonmanagerial work during those periods in which she was asked to help with inventories and remodels at other stores.  The Court credits Plaintiff's uncontroverted testimony that when she was sent to other stores to help with these tasks she spent approximately six hours per day performing manual labor, such as stocking shelves, cleaning, unloading the truck, and so on.

84.     Specifically, the Court finds that Plaintiff spent 16 weeks performing nonexempt work in connection with remodels and inventories: Plaintiff spent four weeks working on the Long Beach remodel; four weeks working on the Maywood remodel; three weeks working on the Downey remodel; and five additional weeks helping other Rite Aid stores with inventory.

85.     Assuming that Plaintiff adjusted her schedule to keep to her typical 45–50 hour week while working on the Long Beach and Maywood remodels, the Court infers that Plaintiff worked four, 45–50 hour weeks during each remodel.

86.     During the Downey remodel, when two of her associates were loaned to the remodel effort, Plaintiff spent the majority of her time on nonmanagerial tasks to compensate for the missing labor.  Accordingly, the Court finds that during the Downey remodel, Plaintiff spent the majority of her time performing nonmanagerial tasks for three weeks, at 12 hours per shift, five days per week; plus one additional eight hour shift on Plaintiff's day off and one additional six hour shift for the grand opening.

87.     Finally, the Court finds that during weeks in which Plaintiff helped other stores with inventory, she worked her typical 45–50 hour week in addition to spending six hours on her day off helping with inventory at the other store.

**F.**     **Failure to Pay Wages Timely**

88.     Plaintiff resigned her employment on April 5, 2013.

89.     All of Plaintiff's wages were due to be paid within 72 hours of Plaintiff's resignation, *i.e.* by April 8, 2013.

90.     Rite Aid did not pay Plaintiff any of the overtime wages or meal and rest break premiums to which Plaintiff believes she is entitled.

91.     Plaintiff's daily wage rate at the time of her resignation was $27.68 per hour.

**G.**     **Procedural History of This Action**

92.     On March 22, 2013, before Plaintiff resigned from Rite Aid, she filed this action in the Los Angeles Superior Court.

93.     On its face, Plaintiff's Complaint alleged two claims. First, the Complaint alleged that Rite Aid failed to pay her overtime wages in violation of California Labor Code section 1194 and the applicable California Industrial Welfare Commission Wage Order 7-2001(3). Second, the Complaint alleged that Rite Aid engaged in an unfair business practice under California Business & Professions Code sections 17200, *et seq.* (the "UCL") by requiring Plaintiff to work without providing meal and rest breaks as required by California Labor Code section 226.7 and Wage Order 7-2001(11)–(12).

94.     On October 26, 2016, the Court held that Plaintiff was entitled to pursue a third claim for Rite Aid's failure to pay her earned and unpaid wages upon termination of her employment, in violation of California Labor Code sections 201 and 202. (*See* Order re Defendant Rite Aid Corporation's Motion for Partial Judgment on the Pleadings and Motion to Exclude Claim for Waiting-Time Penalties from the Pre-Trial Order (the "October Order"), at 1 (Docket No. 118)). In that same October Order, the Court held that Plaintiff's second claim for unpaid meal and rest break wage premiums was restitutionary, and thus properly could be alleged under the UCL.

95.     Trial in this action commenced on November 1, 2016. On November 10, 2016, the matter was submitted to the Court for deliberation.

**H.** **Damages Calculation**

96.     The Court will conclude below that Plaintiff has met her burden of proof as to liability for the weeks in which she worked on remodels or store inventories in other Rite Aid stores.  Accordingly, Plaintiff is entitled to unpaid overtime wages and meal and rest break wage premiums for those weeks.

97.     The legal standards governing the award of (1) damages for Plaintiff's unpaid overtime wages and (2) restitution for Plaintiff's unpaid meal and rest break wages are set forth below, in the Court's Conclusions of Law.  Based on the Court's legal conclusions, the Court finds Plaintiff's award should be calculated as follows:

**1.** **Overtime Premiums**

98.     The Court previously found that Plaintiff worked between 45 and 50 hours per week and that Plaintiff was misclassified as an exempt employee for a total of sixteen weeks.  The Court will take the average of Plaintiff's typical hours and assume that a typical, five-day work week entailed 48 hours of work.

99.     California mandates that an employee be paid one and a half times the employee's regular rate of pay for time worked in excess of 40 hours per week. (*See infra*, ¶¶ 42–44).

100.   Plaintiff presented evidence of her weekly salary for each yearly salary period.  The Court will use Plaintiff's salary during the June 14, 2009 to April 24, 2010 pay period ($1,038.46 per week, or $25.96 per hour) as the "regular rate of pay" for calculating overtime wages while Plaintiff worked as Store Manager of the Downey store.  Plaintiff received this salary for the majority of the time she worked at the Downey store.  The overtime premium wage for this salary is $38.94 per hour.

101.   The Court will use Plaintiff's salary during the April 24, 2011 to May 5, 2012 pay period ($1,080.38 per week, or $27.01 per hour) as the "regular rate of pay" for calculating overtime wages while Plaintiff worked as Store Manager of the Commerce store.  Plaintiff came in to the Commerce store earning a lower salary and received two raises while working there.  The April 2011 to May 2012 pay period is the only pay period

in which Plaintiff worked entirely in Commerce, and is the salary she earned for the majority of the time she worked at the Commerce store. The overtime premium wage for this salary is $40.52 per hour.

102.   The Court will use Plaintiff's salary during the May 5, 2012 to April 5, 2013 pay period ($1,107.39 per week, or $27.68 per hour) as the "regular rate of pay" for calculating overtime wages while Plaintiff worked as Store Manager of the Maywood store. This is the only salary Plaintiff that earned while working at the Maywood store. The overtime premium wage for this salary is $41.52 per hour.

103.   **Long Beach Remodel**:  Plaintiff presented no evidence that she worked more than a typical five-day week while participating in the Long Beach remodel. The Court previously found that Plaintiff spent four weeks working on the remodel. Therefore, Plaintiff's overtime hours for the duration of the Long Beach remodel amount to eight hours per week, for a total of 32 hours. Plaintiff worked at the Commerce store during the Long Beach remodel. The Court thus awards Plaintiff **$1,296.64** in premium overtime wages for the period of the Long Beach remodel.

104.   **Maywood Remodel**:  Plaintiff presented no evidence that she worked more than a typical five day week while participating in the Maywood remodel. The Court previously found that Plaintiff spent four weeks working on the remodel. Therefore, Plaintiff's overtime hours for the duration of the Maywood remodel amount to eight hours per week, for a total of 32 hours. Plaintiff worked at the Maywood store while it was being remodeled. The Court thus awards Plaintiff **$1,328.64** in premium overtime wages for the period of the Maywood remodel.

105.   **Downey Remodel**: The Court previously found that Plaintiff worked 12 hours per day, five days per week for three weeks during the Downey remodel. In addition, Plaintiff worked one eight hour day on her day off and a six hour day during the grand opening of the Downey store. Assuming the grand opening added an additional six hour day to her work week during the three-week period of the Downy remodel, that amounts to 72 hours of overtime. Plaintiff worked at the Commerce store during the

-23-

Downey remodel.  The Court thus awards Plaintiff **$2,998.48** in premium overtime wages for the period of the Downey remodel.

106.  **Inventory**:  The Court previously found that, while working at the Downey store, Plaintiff five times spent six hours on her day off helping other stores with their inventory.  That amounts to 70 hours of overtime over the course of the five weeks (again, assuming Plaintiff worked a 48 hour week each of those weeks).  The Court thus awards Plaintiff **$2,725.80** in premium overtime wages for those weeks in which she assisted other Rite Aid stores with inventory.

107.  In sum, Plaintiff is owed **$8,349.56** in unpaid premium overtime wages.

### 2.   Meal and Rest Break Premiums

108.  The Court concludes below that on those days when Plaintiff properly was classified as nonexempt but worked in her capacity as a Store Manager in her own store, she was denied meal and rest breaks in violation of section 226.7.  On those days when Plaintiff properly was classified as nonexempt and worked as a laborer to assist with remodels and inventory, she was not denied meal and rest breaks.

109.  The Court will apply the same scheme for determining Plaintiff's "regular rate of pay" as outlined above.  California mandates that an employee be paid an additional hour of compensation for each work day that a meal or rest break was not provided.  (*See infra*, ¶¶ 45–48).

110.  **Long Beach Remodel**: The Court previously found that during the Long Beach remodel, Plaintiff worked three days per week for four weeks on the remodel.  The Court further found that Plaintiff did not work more than a five day week during the Long Beach remodel.  Plaintiff was thus denied meal and rest breaks on eight days during the Long Beach Remodel (*i.e.*, those days when she worked as a Store Manager in the Commerce store).  Accordingly, Plaintiff is owed **$216.08** in premium wages for missed meal and rest breaks during the Long Beach remodel.

111.  **Maywood Remodel**: The Court previously found that during the Maywood remodel, Plaintiff worked primarily on remodeling tasks every day of the week.

Accordingly, Plaintiff is not owed premium wages for missed meal and rest breaks during the Maywood remodel.

112. **Downey Remodel**: The Court previously found that during the Downey remodel, Plaintiff performed primarily nonexempt labor as a Store Manager for three weeks, at 12 hours per shift, five days per week; plus one eight hour additional shift on Plaintiff's day off and one six hour day for the grand opening. Plaintiff thus was denied meal and rest breaks on 16 days during the Downey remodel (*i.e.*, every day except the grand opening). Accordingly, Plaintiff is owed **$432.16** in premium wages for missed meal and rest breaks during the Downey remodel.

113. **Inventory**: The Court previously found that Plaintiff spent five weeks while employed as Store Manager of the Downey store participating in inventory days at other Rite Aid stores on her day off. Plaintiff is thus owed premium wages for missed meal and rest breaks for 25 days during that period. (As discussed above, Plaintiff is not owed meal and rest break premium wages for the inventory days themselves.) Accordingly, Plaintiff is owed **$649** in premium wages for missed meal and rest breaks during those weeks.

114. In sum, Plaintiff is owed an additional **$1,297.24** in restitution for unpaid meal and rest break premiums.

115. **In total, Plaintiff is awarded $9,646.80 in damages and restitution.**

## II.   CONCLUSIONS OF LAW

1. The Court concludes that Plaintiff is entitled to some damages for unpaid overtime wages and some restitution for unpaid meal and rest break premiums while she was employed as a Store Manager at Rite Aid. Plaintiff is not entitled to compensation for Rite Aid's refusal to pay Plaintiff those wages when she resigned.

### A.   Claim One: Failure to Pay Overtime

2. Plaintiff has the initial burden of proving the amount and extent of the work she performed "as a matter of just and reasonable inference." *Duran v. U.S. Bank Nat. Assn.*, 59 Cal. 4th 1, 40–41, 172 Cal. Rptr. 3d 371 (2014) (quoting *Anderson v. Mt.*

*Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)).  "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate."  *Id.* (quoting *Mt. Clemens*, 328 U.S. at 687–88).  The purpose of this burden-shifting framework is to prevent employers from benefitting from their own poor recordkeeping.  *Id.*; *accord Brinker Restaurant Corp. v. Sup. Ct.*, 53 Cal. 4th 1004, 1053 n.l, 139 Cal. Rptr. 3d 315 (2012) (Werdegar, J., concurring) (relying on *Mt. Clemens*).

3.     Plaintiff has met her burden.  Here, as in *Duran*, Rite Aid failed to keep accurate records of Plaintiff's work.  *See Duran*, 59 Cal. 4th at 18 (finding that the employer "kept no records of [its employees'] working hours or the proportion of time spent either in or outside bank offices").  Based on the testimony of the witnesses and the scheduling data, the Court has found that Plaintiff typically worked in excess of 40 hours per week.  Accordingly, the burden shifts to Rite Aid to come forward with evidence of the precise amount of work performed.

4.     The evidence Rite Aid offers in response — that Plaintiff regularly arrived a half hour late to work, and that she occasionally left early — is not sufficient to show the precise amount of work Plaintiff performed.  Nor does the evidence negate the reasonableness of the Court's inference that Plaintiff typically worked in excess of 40 hours per week.  Plaintiff testified that she regularly left work more than an hour after she was scheduled to leave, and several witnesses corroborated Plaintiff's testimony.  Moreover, Plaintiff's former District Manager, Marilyn Contreras, informed Store Managers in her district that they were not to leave before 5:00 p.m. without specific permission during a time when Plaintiff was regularly scheduled to arrive at work between 5:00 and 6:30 a.m.  Even assuming Plaintiff did not arrive to work until 7:00 a.m. on those days, complying with her direct supervisor's directive would have required Plaintiff to work ten-hour days.

5.      Accordingly, Plaintiff's showing that she typically worked between 45 and 50 hours per week stands unrebutted.

6.      Nevertheless, under California law, Plaintiff is not entitled to overtime pay if Rite Aid can affirmatively prove that Plaintiff qualifies for a statutory exemption. *See* Cal. Lab. Code §§ 510, 515; *Conley v. Pacific Gas & Electric Co*., 131 Cal. App. 4th 260, 266, 31 Cal. Rptr. 3d 719 (2005). Rite Aid contends that the executive exemption precludes Plaintiff from being awarded overtime pay. In the alternative, Rite Aid contends that the administrative exemption applies. The Court agrees with Rite Aid that the executive exemption applies, at least in part, and accordingly does not reach the applicability of the administrative exemption.

7.      The executive exemption is an affirmative defense that precludes Rite Aid from liability if: (1) Plaintiff's duties and responsibilities involved the management of an enterprise in which she was employed, or of a customarily recognized department or subdivision thereof; (2) Plaintiff customarily and regularly directed the work of two or more other employees; (3) Plaintiff had the authority to hire or fire other employees; (4) in the course of her duties Plaintiff customarily and regularly exercised discretion and independent judgment; (5) Plaintiff was engaged primarily in the above duties, which meet the test of the exemption; and (6) Plaintiff earned a monthly salary equivalent to no less than two times the state minimum wage for full-time employment. *See* Cal. Code Regs. tit. 8, § 11070(1)(A)(1). Because the executive exemption is an affirmative defense, Rite Aid has the burden of proof to show it applies. *See Ramirez v. Yosemite Water Co*., 20 Cal. 4th 785, 794–95, 85 Cal. Rptr. 2d 844 (1999).

8.      The parties do not meaningfully dispute that Plaintiff meets the first three prongs of the executive exemption test. To meet the first prong, an employee "must be in charge of and have as his [or her] primary duty the management of a recognized unit which has a continuing function . . . ." *In re United Parcel Serv. Wage & Hour Cases*, 190 Cal. App. 4th 1001, 1016–17, 118 Cal. Rptr. 3d 834 (2010) ("*UPS*") (quoting 29 C.F.R. § 541.104(a)) (finding first prong met where plaintiff managed a package center

and supervised an identifiable group of employees within that center).  While not mandatory, "a fixed location and continuity of personnel are both helpful in establishing the existence of such a unit." *Id.*  Rite Aid's individual retail locations meet this definition.  *See, e.g.*, *Smith v. Equinox Holdings, Inc.*, No. 14-CV-00846-LB, 2015 WL 1952564, at *6 (N.D. Cal. Apr. 10, 2015) (holding that "brick-and-mortar retail shops, with fixed personnel daily carrying out routinized duties" unquestionably "constitute a 'customarily recognized department or subdivision'" of the employer).  As a Store Manager, Plaintiff managed a customarily recognized department or subdivision of the larger Rite Aid corporation.

9.     Similarly, Plaintiff does not suggest that she did not customarily and regularly direct the work of two or more employees, and the evidence shows that she directed the work of (at least) one Assistant Manager or Shift Supervisor and one clerk/cashier during the course of a typical day.

10.     Plaintiff also does not dispute that she had the authority to hire or fire Rite Aid employees.  Plaintiff admitted as much in her testimony at trial.  Plaintiff's argument that her hiring and firing authority was subject to the approval of her supervisors is better addressed in the discussion of whether she exercised discretion and independent judgment in her capacity as a Store Manager.

11.     Finally, Plaintiff admits that while she was employed as a Store Manager she earned a monthly salary greater than or equal to two times the state minimum wage for full-time employment, the sixth element of the executive exemption test.

12.     Plaintiff vigorously disputes that she qualifies for the executive exemption under the remaining two prongs of the test.

### 1.     Discretion and Independent Judgment

13.     The *UPS* court clarified that the requirement that an employee exercise discretion and independent judgment generally calls for "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered.  The term implies that the person has the authority or

power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." *UPS*, 190 Cal. App. 4th at 1024 (internal alterations removed) (quoting 29 C.F.R. § 541.207(a)). "The requirement that discretion be exercised with respect to 'matters of significance' means the decision being made must be relevant to something consequential and not merely trivial." *Id.* (quoting 29 C.F.R. § 541.207(a)). The *UPS* court emphasized that "[a]n employee who merely applies his [or her] knowledge in following prescribed procedures or determining which procedure to follow, or who determines specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or other categories, with or without the use of testing or measuring devices, is not exercising discretion and independent judgment." *Id.* at 1026. On the other hand, "where . . . employer policies and procedures simply ***channel*** the exercise of discretion and judgment, as opposed to ***eliminating*** it entirely or otherwise constraining it to a degree where any discretion is largely inconsequential, the executive exemption may still apply. . . . Our charge to construe exemptions narrowly is not a directive to render them nonexistent." *Id.* (emphasis in original) (holding that employees who managed individual package locations exercised discretion and independent judgment).

14.     Plaintiff contends that she did not have discretion as to any matters of significance. For one thing, Rite Aid suggested a weekly schedule for Store Managers to follow in certain training materials. Similarly, although Plaintiff was responsible for scheduling employees, the number of hours available to her was strictly rationed according to a labor budget. Plaintiff was not subject to formal discipline for failing to meet her labor budget, but was constantly reminded by her superiors of the labor budget's importance. Rite Aid even provided Store Managers with a checklist to guide them on store walkthroughs. Therefore, Plaintiff contends, her daily decisionmaking was routinized and automated, leaving Plaintiff with little discretion over any significant decisions regarding the management of the store.

15.     However, like the employee in *UPS*, Plaintiff was regularly called upon to exercise her discretion as to other matters of consequence:  Plaintiff was given discretionary power over training employees and appraising employee performance; imposing discipline on her own initiative, including talking with an offending employee to attempt to correct a problem before proceeding through the discipline system; adjusting inventory orders and maintaining relationships with vendors; developing and implementing plans for achieving Rite Aid's various initiatives regarding cleanliness, increased sales, and efficiency (even when the initiatives themselves were passed down to Plaintiff by her District Manager); advising employees on teamwork and proper customer service; and adjusting the labor budget to account for likely variations in customer foot traffic. *See UPS*, 190 Cal. App. 4th at 1024–25.

16.     Therefore, although Plaintiff's discretion may have been curtailed in some instances, Plaintiff still had discretion as to other matters of significance.  For example, Plaintiff was given discretion to hire, discipline, train, and fire employees.  Plaintiff testified that she trained new hires and retrained associates who struggled to complete their work timely and correctly.  If one of Plaintiff's employees continued to provide poor service, Plaintiff had the discretion to counsel the employee informally before speaking with human resources about whether to write up the employee formally.

17.     Plaintiff also had discretion in prioritizing and delegating tasks to her employees on a daily basis.  It was Plaintiff who assigned her employees work day to day. Even when a District Manager directed Plaintiff to prioritize one task over another, it was Plaintiff who determined how her staff could best accomplish that directive.  Similarly, although to some extent Plaintiff's discretion over inventory was channeled by Rite Aid's various ads and promotions, Plaintiff could adjust ordering based on what historically sold well in the store, nearby competitors' upcoming sales, and so forth.

18.     The Court concludes that, like the employees in *UPS*, Plaintiff exercised discretion and independent judgment in her work as Store Manager.

## 2.   "Primarily Engaged" in Exempt Activities

19.   "Under California law, the phrase 'primarily engaged' means 'more than one-half of the employee's worktime' is spent performing duties that qualify as exempt." *UPS*, 190 Cal. App. 4th at 1018.  Plaintiff emphasizes that the trier of fact may not consider otherwise nonexempt duties to be exempt just because "the manager continues to supervise while performing them." *Heyen v. Safeway Inc.*, 216 Cal. App. 4th 795, 826, 157 Cal. Rptr. 3d 280 (2013).  Rather, "the trier of fact must categorize tasks as either 'exempt' or 'nonexempt' based on the purpose for which [Plaintiff] undertook them." *Id.*

20.   Here, Rite Aid itself acknowledged that its Store Managers are not always properly classified as exempt.  The duties of the job may vary, depending on the individual circumstances in each store.  For example, Rite Aid classifies all Store Managers of stores with a front end sales volume of less than $1.5 million as nonexempt. Presumably, this is because these Store Managers must help out with the nonmanagerial side of the business to such an extent that they cannot properly be classified as exempt. Therefore, it is quite conceivable that some Store Managers who manage stores with a front end sales volume of more than $1.5 million would also find themselves primarily engaged in nonexempt duties.  A particularly diligent or particularly under-staffed Store Manager might find that she spends more time stocking and serving customers than supervising her employees, overseeing payroll, and managing the labor budget.  In other words, it is quite likely that in certain of Rite Aid's stores there is more work to delegate than hourly employees available to delegate to.

21.   Nevertheless the Court concludes that, for the most part, *this* Plaintiff was primarily engaged in exempt duties.  As discussed above, the Court credits the testimony of those witnesses who recalled that Plaintiff was more likely than not to be in the office during the work day.  Although the parties debated what Plaintiff was doing while in the office, the Court finds this issue to be irrelevant.  If Plaintiff was in the office, she logically could not have been performing the sorts of nonmanagerial, manual tasks typically assigned to nonexempt store associates.  Plaintiff could not have been, for

example, stocking shelves, ringing up customers, or cleaning bathrooms while she was inside the office.  Rather, she must have been engaging primarily in managerial tasks, such as reviewing payroll, scheduling employees, speaking on the phone with vendors, or any one of a number of other discretionary tasks for which Plaintiff was responsible. Therefore, any time Plaintiff spent in the office was necessarily dedicated primarily to managerial tasks.  And, as the Court also found above, Plaintiff performed at least some de minimus managerial tasks while walking the floor.  Accordingly, the Court concludes that during a typical work week Plaintiff spent the bare majority of her time engaged in exempt activities.

22.    Because the Court concludes that Plaintiff was not "multitasking" while completing most of her managerial tasks, the Court does not consider Plaintiff's arguments under *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785, 802, 85 Cal. Rptr. 2d 844 (1999) (requiring work time to be apportioned as either exempt or nonexempt). Nor need the Court consider Rite Aid's affirmative defense under *Ramirez* that Plaintiff was not performing her job duties according to Rite Aid's reasonable expectations — Plaintiff typically performed her Store Manager duties according to the job description.

23.    However, as discussed above in the Findings of Fact, Plaintiff spent a majority of her time on nonmanagerial — and thus, nonexempt — tasks during weeks in which she helped with remodels and inventories.  The Court previously found that during remodels and inventories, Plaintiff spent most of her time on manual tasks like stocking shelves, cleaning, unloading the truck, and so on.  Even during weeks in which Plaintiff assisted with inventory or a remodel only on her day off, the Court concludes that this was sufficient to shift the balance of her time, such that she was primarily engaged in nonexempt work during that week.  In total, this amounts to sixteen weeks in which Plaintiff was misclassified because she was primarily engaged in nonexempt work.

**B.    Claim Two: Failure to Provide Meal Periods and Rest Breaks**

24.    California Labor Code section 226.7 states that "[i]f an employer fails to provide [a nonexempt] employee a meal or rest or recovery period . . . the employer shall

pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest or recovery period is not provided." *Id; see also* Cal. Lab. Code § 512; Cal. Code Regs., tit. 8 § 11050(11).  In *Brinker*, the California Supreme Court recently clarified an employer's duty with respect to meal breaks under section 512(a) "is an obligation to provide a meal period to its employees." 53 Cal. 4th at 1040.  "The employer satisfies this obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so." *Id.*  Therefore, to comply with the Labor Code, an employer must affirmatively relieve its employee of all duty:  "doing so transforms what follows into an off-duty meal period, whether or not work continues." *Id.* at 1039–40.

25.    Employers also must provide "a net 10 minutes of rest . . . in each 'work period' and the rest period must be, as the language implies, duty-free." *Augustus v. ABM Sec. Servs., Inc.*, 2 Cal. 5th 257, 267, 211 Cal. Rptr. 3d 634 (2016) (quoting and adopting Dept. Industrial Relations, DLSE Opn. Letter No. 2002.02.22 (2002)).  "That is, during rest periods employers must relieve employees of all duties and relinquish control over how employees spend their time." *Id.* at 269.

26.    In its October Order, the Court held, joining the majority of courts in the Central District, that Plaintiff's claims for payments under section 226.7 of the California Labor Code are restitutionary because they are akin to overtime wages.  Therefore, any unpaid meal and rest break premiums are recoverable under the UCL.  To the extent that Rite Aid renews its arguments that unpaid meal and rest break premiums are not wages and are not recoverable under the UCL, the Court declines to revisit its prior Order.

27.    Because Plaintiff was classified as an exempt employee, Rite Aid did not make an effort affirmatively to relieve Plaintiff of all duty for 30 minutes to permit her to take an off-duty lunch break.  Similarly, Rite Aid did not make an effort to ensure Plaintiff received rest breaks.  Rather, Plaintiff was expected to be on duty to field questions throughout her shift, even during her lunch hour.  The testimony at trial reflected, and the

Court thus found, that Plaintiff regularly was interrupted during her lunch break to field associate questions or assist with a problem on the floor. Often, no other member of the management team was available to assist store associates during Plaintiff's lunch hour. If associates had questions, Plaintiff's lunch was interrupted by necessity.

28.     In contrast, when Plaintiff assisted with remodels and inventories, the testimony reflects that Rite Aid appropriately treated Plaintiff like an hourly employee, ensuring that she was provided the opportunity to take uninterrupted meal and rest breaks.

29.     Accordingly, the Court concludes that on those days when Plaintiff should have been classified as nonexempt and worked in her capacity as a Store Manager in her own store, she was denied meal and rest breaks in violation of section 226.7. On those days when Plaintiff properly should have been classified as nonexempt and worked as a laborer to assist with remodels and inventory, she was not denied meal and rest breaks.

## C.     Claim Three: Failure to Pay Timely Wages

30.     California Labor Code section 203 provides that "[i]f an employer willfully fails to pay . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced . . . ." Plaintiff contends that Rite Aid willfully failed to pay her overtime wages and meal and rest break premium wages when she terminated her employment, and thus Rite Aid should be required to pay the waiting time penalty under section 203.

31.     "Willfulness" is defined in the California Code of Regulations to occur "when an employer *intentionally* fails to pay wages to an employee whose wages are due." Cal. Code Regs. tit. 8, § 13520 (emphasis added). "[A] good faith dispute that any wages are due will preclude imposition of waiting time penalties under Section 203." *Id.* The regulations further define a "good faith dispute" as occurring "when an employer presents a defense, based in law or fact which, if successful, would preclude any recovery on the part of the employee." *Id.* § 13520(a). The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist." *Id.*

32.     Here, the Court concludes that Rite Aid disputed in good faith whether Plaintiff was properly classified as an exempt employee, precluding the application of waiting time penalties.  Rite Aid's exemption defense was partially successful, and thus was based on a good faith reading of the law.  Rite Aid's arguments that it did not owe Plaintiff unpaid overtime or meal and rest break premium wages were "neither unreasonable nor frivolous[.]"  *FEI Enterprises, Inc. v. Kee Man Yoon*, 194 Cal. App. 4th 790, 802, 124 Cal. Rptr. 3d 64 (2011).  Plaintiff is not entitled to waiting time penalties under section 203.

### D.     <u>Rite Aid's Affirmative Defenses</u>

33.     In the Final Pretrial Conference Order (Docket No. 125), Rite Aid indicated that, in addition to its exemption defenses, it planned to pursue a plethora of other affirmative defenses at trial.  The Court need not separately address most of these; Rite Aid's affirmative defenses regarding unpaid wages, for example, are addressed above in the context of Plaintiff's claims.  Others, such as Rite Aid's contention that Plaintiff failed to mitigate her damages, or Rite Aid's statute of limitations defense, were not meaningfully pursued at trial.  Therefore, Rite Aid did not meet its burden of proof as to those affirmative defenses.  The Court notes that virtually all of the affirmative defenses were simply different iterations of Rite Aid's factual and legal arguments.

34.     One affirmative defense was regularly alluded to by the parties during trial, and thus remains to be addressed.  Rite Aid contends that Plaintiff is estopped from pursuing her claims for unpaid overtime and meal and rest break premiums under the UCL.  The theory hinted at by both parties during trial appears to be that, by continuing to work as a Store Manager without challenging her misclassification, Plaintiff misled Rite Aid to its detriment.  Throughout the trial, Rite Aid emphasized that it includes in training materials its expectation that Store Manager spend at least 50% of their time performing exempt labor.  Rite Aid's theory appears to be that, having been made aware of Rite Aid's expectation that Store Managers would primarily perform exempt duties, Plaintiff misled Rite Aid by not reporting that she was unable to meet those expectations.

35.     In support of its defense, Rite Aid cites only to generic authorities on equitable estoppel.  Neither of the two cases upon which it relies, *Lantzy v. Centex Homes*, 31 Cal. 4th 363, 384 (2003), or *Shaffer v. Debbas*, 17 Cal. App. 4th 33, 43 (1993), applies the doctrine of equitable estoppel to an employment claim.

36.     An action under the UCL is equitable in nature and thus allows a plaintiff to "recover money or property obtained from the plaintiff or persons represented by the plaintiff through unfair or unlawful business practices."  *Cortez v. Purolator Air Filtration Prod. Co*., 23 Cal. 4th 163, 173, 96 Cal. Rptr. 2d 518 (2000).  Equitable considerations, including defenses like equitable estoppel, "may enter into the court's disposition of a UCL action."  *Id.* at 179.  However, equitable defenses are only partial defenses; they "may not be asserted to wholly defeat a UCL claim since such claims arise out of unlawful conduct."  *Id.; see also*, *Salas v. Sierra Chem. Co*,, 59 Cal. 4th 407, 432, 173 Cal. Rptr. 3d 689 (2014) ("Equitable defenses . . . may not, however, be used to wholly defeat a claim based on a public policy expressed by the Legislature in a statute."); *Dominguez–Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1041 (9th Cir. 2005) (recognizing that a "partial affirmative defense" is one that limits or influences the remedies that the court may impose but does not preclude liability).  Therefore, although Rite Aid's equitable estoppel defense may be taken into consideration by the Court when awarding restitution, it may not preclude recovery entirely.

37.     Here, the Court sees little reason to limit Plaintiff's recovery.  Although it may be technically true that Rite Aid informed its Store Managers that it expected them to spend the majority of their time on exempt work, the information was primarily conveyed via computer based trainings — trainings that were easy to ignore, especially because Store Managers could easily click through them while engaged in other tasks, like helping customers at the register.  Rite Aid managed to make clear to Store Managers its expectations regarding labor budgets, store cleanliness, and sales targets through regular emails and reminders by District Managers.  If Rite Aid had truly cared to emphasize the need for Store Managers to spend a majority of their time on exempt tasks, it could have

done so.  Indeed, prior to Plaintiff's time as a Store Manager, Rite Aid provided self-audits to Store Managers, at least partially to encourage mindfulness as to how they were spending their time.  The Court thus finds and concludes that Plaintiff did not mislead Rite Aid by failing to self-report her misclassification.

38.   Rite Aid fails to prove its partial affirmative defense.

**E.   Remedies**

39.   It is Plaintiff's burden to prove the amount of adequate compensation with reasonable certainty.  *E.g.*, *Clemente v. State of California*, 40 Cal. 3d 202, 219, 219 Cal. Rptr. 445 (1985).  However, Plaintiff need not prove the amount of compensation with the same definiteness that was required to show liability.  *Id.*; *see also Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 881 n.26 (9th Cir. 2012) (applying the *Clemente* standard to hold that, in California, "some uncertainty can arise in any calculations of damages, but that does not preclude recovery where it is clear that some damage has occurred").  As the *Clemente* court explained, "[i]t is desirable that responsibility for harm should not be imposed until it has been proved with reasonable certainty that the harm resulted from the wrongful conduct of the person charged.  It is desirable, also, that there be definiteness of proof of the amount of damage as far as is reasonably possible.  It is even more desirable, however, that an injured person not be deprived of substantial compensation merely because [she] cannot prove with complete certainty the extent of harm [she] has suffered."  *Clemente*, 40 Cal. 3d at 219.

40.   This general principle favoring recovery applies to the wage and hour context, as well.  As the Court discussed above, California courts allow that "[i]f the employer fails to produce such evidence," that Plaintiff worked compensable overtime hours, "the court may then award damages to the employee, even though the result be only approximate."  *Duran*, 59 Cal. 4th at 41 (quoting *Mt. Clemens*, 328 U.S. at 687–88).

41.   Here, Plaintiff has proved her damages with sufficient certainty.

1

### 1.   Overtime Premiums

2       42.   California mandates that an employee be paid one and a half times the

3   employee's regular rate of pay for time worked in excess of 40 hours per week.  *See* Cal.

4   Lab. Code § 510(a); *Peabody v. Time Warner Cable*, *Inc.*, 59 Cal. 4th 662, 667, 174 Cal.

5   Rptr. 3d 287 (2014) ("Employers must compensate such employees [who work more than

6   40 hours in any one workweek] 'at the rate of no less than one and one-half times the

7   [employee's] regular rate of pay.'").  Plaintiff provided evidence of her hourly rate of pay

8   for the duration of her employment as a Store Manager.

9       43.   The Court previously concluded that Rite Aid incorrectly classified Plaintiff

10   as exempt on those weeks when she worked as a laborer to assist with remodels and

11   inventory.  Because Rite Aid failed to meet its burden of proof to show that Plaintiff was

12   primarily engaged in exempt labor during those weeks, it owes Plaintiff overtime wages

13   for any overtime hours worked.

14       44.   As calculated above in the Findings of Fact, Plaintiff is owed **$8,349.56** in

15   unpaid premium overtime wages.

16

### 2.   Meal and Rest Break Premiums

17       45.   In its October Order, the Court agreed with the majority of courts in the

18   Central District that meal and rest break premium wages are a form of restitution under

19   the UCL. (Oct. Order at 3–5).  Accordingly, the Court next considers what unpaid wages

20   are owed to Plaintiff as a result of missed meal and rest breaks during weeks in which she

21   was misclassified as an exempt employee.

22       46.   As discussed above, an employer is required to make available to its

23   nonexempt employees an uninterrupted, 30 minute meal period after five hours of work.

24   California further provides that, "[i]f an employer fails to provide an employee a meal or

25   rest or recovery period in accordance with a state law . . . the employer shall pay the

26   employee one additional hour of pay at the employee's regular rate of compensation for

27   each workday that the meal or rest or recovery period is not provided."  Cal. Lab. Code §

28   226.7(c); *see also Kirby v. Immoos Fire Prot., Inc.*, 53 Cal. 4th 1244, 1256, 140 Cal. Rptr.

3d 173 (2012) (reaffirming that "the remedy for a violation of the statutory obligation to provide IWC-mandated meal and rest periods is one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided") (quotation marks and citations omitted).

47.     The Court previously concluded that on those weeks when Plaintiff should have been classified as nonexempt and worked in her capacity as a Store Manager in her own store, she was denied meal and rest breaks in violation of section 226.7.  On those days when Plaintiff properly should have been classified as nonexempt and worked as a laborer to assist with remodels and inventory, she was not denied meal and rest breaks.

48.     As calculated above in the Findings of Fact, Plaintiff is owed an additional **$1,297.24** in restitution for unpaid meal and rest break premium wages

### III.   <u>VERDICT</u>

The Court **FINDS** and **RULES** as follows:

On Plaintiff's Claim One for unpaid overtime wages, Defendant Rite Aid misclassified Plaintiff as an exempt employee during periods in which she participated in remodels and inventories.  The Court thus finds in favor of Plaintiff.

On Plaintiff's Claim Two for failure to provide meal periods and rest breaks, Defendant Rite Aid failed to provide Plaintiff the opportunity to take an off-duty meal or rest break on those days when Plaintiff properly should have been classified as nonexempt and worked in her capacity as a Store Manager in her own store.  The Court thus finds in favor of Plaintiff.

On Plaintiff's Claim Three for failure to pay timely wages, Defendant Rite Aid did not willfully fail to pay Plaintiff the wages she was owed.  The Court thus finds in favor of Defendant.

In total, Plaintiff is owed $9,646.80 in damages and restitution.

The Court will enter a separate judgment pursuant to Federal Rules of Civil Procedure 54 and 58(b).


Dated:  March 28, 2017

MICHAEL W. FITZGERALD
United States District Judge

# Appendix 1
## List of Exhibits at Trial

**Exhibit 2.**   Documents produced by Plaintiff Marine Bargas at Deposition

Exhibit 2 includes a number of documents, all of which Plaintiff brought with her to her deposition.  At trial, the following documents were discussed:

- An email from Marilyn Contreras to Plaintiff and two other people, dated October 1, 2012, congratulating Plaintiff for passing a "tobacco sting."  After reading the email, Plaintiff agreed that she spent time training her staff to be prepared for unexpected audits, mystery shoppers, and government regulators.
- A document titled "Rite Report: *Store Leadership View*," dated September 8, 2012, that provides an overview of the Maywood store's performance according to several metrics (including payroll as a percentage of profits, out of stock, etc.).  Certain metrics had been circled, and it could be inferred that Plaintiff discussed these metrics with her staff and took steps to improve the store's performance.
- Plaintiff's Self Evaluation for her 2013 Performance Review, in which she mentioned an interest in taking management development courses.

**Exhibit 3.**   6/11/01 Bargas' Application for Employment

Exhibit 3 was used to impeach Plaintiff on cross examination.  Her application for employment at Rite Aid included some untrue statements, even though Plaintiff signed to certify that everything included in the application was true.

**Exhibit 4.**   Rite Aid Job Description for Store Manager (California Only)

The Store Manager Job Description was introduced through the testimony of Paul Bennie, who explained that it had been distributed to Store Managers, including Plaintiff, at a training. (Plaintiff testified that she did not remember ever receiving the job description or attending the Store Manager training.)  The Job Description instructed

managers to spend the majority of their time on tasks that require them to "exercise their independent judgment and discretion."  Counsel for Plaintiff questioned several witnesses about whether the tasks listed in the Job Description truly were managerial in nature, and how long Rite Aid expected any given task to take.

Plaintiff testified that she regularly performed all of the essential job duties listed in the Job Description.

**Exhibit 8.**   2011 Bargas Annual Performance Review

Exhibit 8 is Plaintiff's performance review for 2011, when she was managing the Commerce store.  Plaintiff was rated "competent," generally met or exceeded expectations, and was given a raise.  The performance reviews do not include a metric to ensure that Store Managers perform more than 50 percent of their time on exempt work.

**Exhibit 9.**   2012 Bargas Annual Performance Review

Exhibit 9 is Plaintiff's performance review of 2012; Plaintiff was still managing the Commerce store.  Plaintiff was rated "competent," generally met or exceeded expectations, and was given a raise.  The performance review included a statement from the District Manager that Plaintiff did a "solid job at leading her store team" and "improved the working environment . . . ."

**Exhibit 10.**  2/7/13 Counseling / Development Form issued to Bargas

Exhibit 10 reflects that in 2013, District Manager Marilyn Contreras wrote Plaintiff up for failing to meet "basic operating procedures," which Contreras attributed to a "lack of leadership and organization."  Contreras testified that Plaintiff had been failing to meet her labor budget, and that Contreras had received a few complaints about Plaintiff from her employees.

**Exhibit 11.**  6/2/10 Counseling / Development Form issued to Bargas

Exhibit 11 reflects that in 2010, District Manager Jason Jalili wrote Plaintiff up for arriving late to work.

**Exhibit 13.**  2012 Overall Compensation Performance Summary for Bargas

Exhibit 13 reflects that Plaintiff received a bonus based on the volume of front end sales within the Commerce store in 2012.  The bonus was awarded for certain managerial decisions that Plaintiff made, which improved the customer and employee experience.

**Exhibit 14.**  Rite Aid 30(b)(6) Deposition Notice

Marilyn Contreras testified that she believed she was knowledgeable on the topics contained in the 30(b)(6) Deposition Notice.

**Exhibits 18–22.**    Emails Regarding Labor Plans

Plaintiff's counsel discussed a number of emails with Marilyn Contreras, all on the topic of labor budgets and labor plans.  The emails emphasized that Store Managers were expected to meet their labor budgets as closely as possible.  One email, sent to Plaintiff and Contreras, along with other Store Managers, stated that Store Managers "[m]ust make [the] labor plan every week without exception."  Store Managers were also forwarded emails indicating whether they were over- or under- budget; Store Managers were expected to make corrections right away if they were not meeting the budget.

**Exhibit 24.**  Objections and Responses to 30(b)(6) Deposition Notice

Exhibit 24 was used to lay the foundation for a discussion of Marilyn Contreras' designation as Rite Aid's 30(b)(6) witness.  Contreras was noticed to testify regarding the number of hours plaintiff was expected to work per workday and/or workweek, but Rite Aid did not keep track of Plaintiff's hours while she was employed as a Store Manager.

1 **Exhibit 33.** Ceballos Deposition Notes

2      Roger Ceballos' notes from his deposition included a list of managerial tasks that a

3 store manager was expected to do. These tasks included interviewing, hiring, training,

4 and disciplining associates; reviewing performance and providing feedback; resolve

5 customer complaints; and reviewing sales results and strategizing how to improve those

6 results. Ceballos could not say whether or how much time Plaintiff spent on any of the

7 tasks in his list while she was employed as a Store Manager.

8

9 **Exhibit 44.** 4/18/11 Email from Jalili

10      Exhibit 44 is an email from Jason Jalili emphasizing to Store Managers that Rite

11 Aid strongly preferred to avoid paying employees overtime wages. Marilyn Contreras

12 testified that Rite Aid's preference was consistent from before she arrived through the

13 time that Plaintiff left Rite Aid.

14

15 **Exhibit 45.** 2/6/13 Email from Contreras

16      Exhibit 45 is an email from Marilyn Contreras to Plaintiff and other Store Managers

17 instructing them to have schedule completed by early morning on Wednesday. The email

18 states that it is important to have schedules out by then because Contreras would schedule

19 weekly visits to stores based on the submitted schedules. She expected store managers to

20 be in the store at times when they were scheduled.

21

22 **Exhibit 46.** 3/30/12 Email from Barron

23      Exhibit 46 is an email from Hector Barron, addressed to Plaintiff and other Store

24 Managers. The email includes a list titled "A few priorities": the first item states "[l]abor

25 non-negotiable must make planned hours" while most of the remaining items in the list

26 emphasize various tasks for keeping the store clean and neat. Ultimately, Store Managers

27 were responsible for keeping their stores neat and clean.

28

**Exhibits 49, 51–55.**  Emails from dmaasc@sysm.riteaid.com in 2011

Exhibits 49 and 51–55 include labor statistics for various stores in the district, including Plaintiff's store.  Recipients were instructed to cut any scheduled hours exceeding the labor budget and to correct their schedules to achieve an efficiency of at least 65%.  Marilyn Contreras testified that at some point she began instructing Store Managers to achieve an efficiency of at least 70%.

**Exhibit 59.**  9/7/10 Email from dmalal@sysm.riteaid.com

Exhibit 59 is an email from an individual identified as "KN," dated September 7, 2010.  The email instructs Store Managers to email KN if their number of scheduled hours is greater than their labor budget.  In testimony, it became clear that this could happen when minimum union hour requirements conflicted with the labor budget.

**Exhibit 61.**  Spreadsheet of Bargas Payroll History

Exhibit 61 includes data from Rite Aid's payroll system, and includes data regarding Plaintiff's paychecks from March 28, 2009 through March 31, 2013.

**Exhibit 63.**  CA Front End Manager Audit

Exhibit 63 is a print-out of an electronic communication sent in 2006.  The worksheet asked Store Managers to conduct a self-audit to determine whether they were spending more than 50% of their time on nonexempt duties.  Rite Aid stopped distributing this sort of self-audit after 2006.

**Exhibit 68.**  Kronos Time Records

Exhibit 68 is data from Rite Aid's time and attendance system.  It includes data regarding Plaintiff's time punches and scheduled time from December 5, 2009 through March 18, 2013.

**Exhibit 69.**  FE Inventory Day Expectations Checklist

Exhibit 69 is a document titled "Inventory Day Expectations" that sets out requirements for Store Managers on inventory day.

**Exhibits 74–75.**   Emails from Jalili

Exhibits 74 is an email authored by Paul Bennie and forwarded by Jason Jalili to "undisclosed recipients" in 2010.  The email explains that Store Managers are expected to attend refresher courses on the on-site leadership training (the same training at which, Bennie testified, the Job Description was circulated to Store Managers).  The 2011 email states that Jalili expects 100% of his store managers to have completed the online leadership refresher training "by the end of the week."

**Exhibit 78.**  9/2/12 Email from Contreras

Exhibit 78 is an email from Marilyn Contreras to all of the Store Managers under her supervision, including Plaintiff.  The email instructs Store Managers to work 2 weekends per month, 1 to 2 nights per week, and states that "[n]o manager is to leave the store before 5pm unless previously discussed with the [District Manager.]"

**Exhibit 92.**  2010 Bargas Annual Performance Review Including Self Assessment and Supervisor Assessment

Exhibit 92 is Plaintiff's performance review for 2010, when she was managing the Downey store.  Plaintiff was rated "competent," generally met or exceeded expectations, and would have been qualified for a raise.

**Exhibit 104.**  2013 Bargas Annual Performance Review Including Self Assessment and Supervisor Assessment

Exhibit 104 is Plaintiff's 2013 performance review.  Marilyn Contreras completed the Supervisor Assessment but did not give the form to Plaintiff because Plaintiff left Rite

Aid first.  Plaintiff was rated "needs development," meaning her performance only meets some job requirements, and Contreras wrote that Plaintiff "needs to understand the Manager role before she can move on to the next step; we will put together an [Associate Development Plan]."

**Exhibits 106–125.**  Counseling/Development Forms

Exhibits 106–25 are examples of Counseling/Development Forms that Plaintiff issued to her employees while she was employed as a Store Manager.  A Counseling/Development Form is a form of informal discipline for Rite Aid employees.

**Exhibit 148.**  Computer-Based Training History for Bargas

Exhibit 148 is a record of all the computer-based trainings, or "CBTs", that Plaintiff completed starting in February 2011.  Page 8 includes an entry for "CA Store Manager Leadership Training," marked completed by Plaintiff on October 11, 2009.  The entry is an acknowledgement that Plaintiff attended the on-site leadership training at which the Job Description was distributed to Store Managers.

**Exhibit 149.**  Store Management Guide

Exhibit 149 is a thick packet titled "Store Management Guide."  It contains a number of forms, including the Store Visit Guide (page 72), which District Managers used to evaluate stores during walk-throughs.

**Exhibits 155–56.**  Store Bonus Program Quick Reference Guide

Exhibits 155 and 156 set out bonus requirements for fiscal years 2011 and 2012.  Store Managers were evaluated, in part, on the store's earnings before interest, tax, depreciation, and amortization ("EBITDA").  Plaintiff testified that she was not trained on the bonus program and did not pay much attention to the requirements in the guides.

**Exhibit 160.**  New Hire Orientation — Store Management Guide

Exhibit 160 is a large binder containing Rite Aid's 2010 management development program.  Rite Aid provides the materials to employees it is training to become managers. Plaintiff likely completed a similar program in 2009.  Page 3 states that "[l]abor budgets are tighter than previous years and our capital expenditures are minimized however, every associate can be friendly, we can engage each and every customer and all stores can be clean and orderly."  The page goes on to state, "We need to beat our labor and expense plans.  Operating more efficiently and spending less are vital to our bottom line.  We have very challenging budgets.  Driving costs out of the operating model will remain a priority. Everyone is accountable to the P&L"

The binder gives Store Managers instructions on training, customer service, and other Store Manager responsibilities.


**Exhibits 175–76.**  Store Managers as Leaders — Field Management Training (Video)

Exhibit 175 is a video of the computer based training given to Store Managers to refresh them on the 2009 on-site leadership training developed by Bennie.  The training stated that Rite Aid expects Store Managers to regularly spend more than 50% of their time on managerial tasks.  Exhibit 176 is the visual demonstrative that accompanied the video.


**Exhibit 177–78**.  California Store Manager Leadership Training (Video)

Exhibit 177 is a video of a computer based training given to Store Managers, covering Rite Aid's expectations for Store Managers.  Exhibit 178 is the visual demonstrative that accompanied the training.  Page 3 includes a button for the Store Manager to click upon finishing the training, titled "I Acknowledge."  The page states, "By clicking on 'I Acknowledge,' you indicate that you will follow Rite Aid's California Store Manager Leadership Structure expectations."  Plaintiff testified that she clicked "I

Acknowledge" at the end of the training, although she also testified that she likely did not pay much attention to the training itself.

**Exhibit 180.**  California Store Manager Leadership Expectations

Exhibit 180 is a demonstrative for the computer based training video, "CA Store Manager Leadership Expectations."  This video training was distributed to Store Managers in 2010.  Exhibit 148 indicates that Plaintiff completed Exhibit 180 on October 24, 2010 at 3:08 a.m.  The exhibit states that the objective of the training was to provide Store Managers with a refreshed understanding of the primary purpose of the California store manager position, Rite Aid's expectations regarding California store manager leadership, and awareness of how Store Managers spend their time and whom to contact with concerns regarding leadership expectations.

**Exhibit 182.**  California Store Manager Leadership Expectations

Exhibit 182 is essentially the same as Exhibit 180, except it was distributed to Store Managers in 2011.

**Exhibit 183.**  Powerpoint Presentation Related to 2009 Store Manager Training

Exhibit 182 is the PowerPoint presentation created to accompany the 2009 on-site Store Manager training developed by Paul Bennie.  The PowerPoint presentation includes instructions to store managers regarding the importance of training and delegation.  The PowerPoint presentation also includes several slides noting that Store Managers of stores with a low volume of sales ($750 thousand to $1.25 million) are classified as nonexempt.

**Exhibits 185, 185A–D**.  Scheduling Data

Exhibit 185 is an excel file containing Rite Aid's scheduling data for the relevant time period.  Exhibit 185 A is a printout of a spreadsheet including all of the data related to

Plaintiff's schedule from December 2009 through March 2013.  Exhibits 185B through D organize the scheduling information as a series of demonstrative graphics for the Court.

**Exhibit 188.**  Labor and Sales Statistics for Store Nos. 5466, 5432, and 5479 When Bargas was Store Manager at Each Location

Exhibit 188 includes labor and sales statistics for all of Plaintiff's stores (Maywood, Downey, and Commerce) during the time in which she was the Store Manager of each location.  The data indicates that Plaintiff sometimes exceeded and sometimes came in under her labor budget.

**Exhibit 192.**  Chart of Bargas' Schedule

Exhibit 192 contains a chart summarizing Plaintiff's schedule data, as contained in Exhibit 185A.  The chart contains an empty space between approximately late June and early October 2010, during which time Plaintiff was on maternity leave.  Otherwise, the chart shows that Plaintiff typically was scheduled for a 9 hour shift, with some variation. The parties dispute whether the schedule data, contained in Exhibit 185A and displayed in Exhibit 192, accurately reflects times when Plaintiff was actually at work.

**Exhibits 193–95.**  Store 5432 Labor and Sales

Exhibits 193–95 are graphical representations of the data contained in Exhibit 188. The charts show that Plaintiff sometimes exceeded and sometimes came in under her budget at the three stores she managed.  Defendants contended that these charts show that Plaintiff did not face strong pressure to meet her labor budget.

**Exhibit 203.**  Yam's Employee Action Forms

Exhibit 203 contains performance reviews and associate development plans for Rebecca Yam.  The performance reviews include self-assessments discussing Yam's managerial activities.  In one self-assessment, Yam mentioned that she could improve by delegating to associates more often.

1

2   **Exhibit 211.**  Daily Routine Chart

3        Exhibit 211 is a list of routines that Marilyn Contreras gave to Store Managers in

4   her district.  Yam testified that Contreras provided the Store Managers with daily, weekly,

5   and monthly routines that she expected Store Managers to follow.

6

7   **Exhibit 212.**  Store Manager Work-Time Self Audit

8        Exhibit 212 is a document that was given to store managers at a meeting, to fill out

9   by hand.  Exhibit 212, like Exhibit 63, asked store managers to self-report whether more

10  than 50% of their time was spent on nonexempt, nonmanagerial tasks.  According to

11  testimony, Rite Aid stopped asking Store Managers to fill out self-audits after about 2006.

12       This particular self-audit was apparently filled out by Rebecca Yam and signed by

13  her on February 15, 2005.  Yam testified that she filled out the audit at an offsite meeting.

14

15  **Exhibit 213.**  Punch Records

16       Exhibit 213 is a disk containing the punch records for Cynthia Pena, who was a

17  Price Accuracy Coordinator under Plaintiff.

18

19

20

21

22

23

24

25

26

27

28